UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,                Docket No. 17 CR 366 (JFB)

    - against -

JOSUE PORTILLO,
                Defendant.
-----------------------------------------------------------------X

## JOSUE PORTILLO SENTENCING MEMORADUM

                              JOSEPH W. RYAN, JR., P.C.
                              JOSEPH W. RYAN, JR. (2408)
                              *Attorneys for Defendant*
                              *JOSUE PORTILLO*
                              MELVILLE LAW CENTER
                              225 OLD COUNTRY ROAD
                              MELVILLE, NY 11747
                              516 629 4896
                              joeryanlaw@earthlink.net

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1
    A.  JOSUE'S BACKGROUND ................................................................................. 2
    B.  JOSUE'S BEHAVIOR WAS PREDICTABLE ................................................. 4
    C.  THE IMPACT OF A LIFE SENTENC ................................................................ 5
    D.  MOTION FOR DOWNWARD DEPARTURE ................................................... 5
    E.  APPLYING THE 18 U.S.C. 3553 (a) FACTORS ................................................. 7
    F.  DESIGNATION ..................................................................................................... 8

CONCLUSION ....................................................................................................................... 9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Miller v. Alabama*, 567 U.S. 460, 471 (2012)..........................................................................1
*Montgomery v. Louisiana, 136 S. Ct. 718, 736* (2016)..........................................................1, 8
*Roper v. Simmons,* 543 U.S. 551, 570 (2005)..........................................................................1
*Tapia v. United States*, 564 U.S. 319, 325 (2011)...................................................................7
*United States v. Blarek*, 7 Fed. Supp 2d 192, 210 (EDNY 1998)...........................................7
*United States v. Briones,* 890 Fd3d 911 (9 Cir.2018)..............................................................6
*United States v. Pete,* 819 F3d 1121 (9 Cir 2016)....................................................................6

**Other Authorities**

18 U.S.C. 3553..........................................................................................................................7
18 U.S.C. 3624 (b)....................................................................................................................5
*Life Sentences in the Federal System,* United States Sentencing Commission (2015)...........5
*Youthful Offenders in the Federal System*, United States Sentencing Commission (2017) ....... 2, 6

# **PRELIMINARY STATEMENT**

We implore the Court to *reject* the Probation Department's recommendation that 17-year old Josue Portillo should be sentenced to life imprisonment for his participation in the quadruple murders at 15-years of age. The recommendation rests upon the following rationale:

> Although there have been numerous MS-13 defendants sentenced before your Honor involving multiple murders, the level of violence and force used in this offense is unparallel in the majority of cases before the Court. This defendant, who had opportunities for a different lifestyle, opted to join a ruthless criminal gang for easy access to drugs. Within a very short time, he became involved in the calculated planning of several murders. *The only viable solution to this level of violence and discard for life is incapacity through incarceration.* The Probation Department does not take to recommending a life sentence lightly, especially for a defendant so young; however, to adequately afford sufficient punishment, general/specific deterrence, and to afford societal protection in accord with the level of violence and harm caused by this defendant, it is warranted in this offense. Emphasis suppled.

To accept this recommendation would, in our opinion, violate the cardinal principles underlying juvenile jurisprudence declared by the United States Supreme Court: (1) "Children are constitutionally different from adults for purposes of sentencing." *Miller v. Alabama*, 567 U.S. 460,471 (2012); (2) Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character" than are the actions of adults. *Roper v. Simmons,* 543 U.S. 551, 570 (2005) and (3) "Children who commit even heinous crimes are capable of change." *Montgomery v. Louisiana, 136 S. Ct. 718, 736* (2016). The Supreme Court has explained its reasoning:

> First, children have a "lack of maturity and undeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking... *Second, children "are more vulnerable... to negative influences and outside pressures, including from their family and peers";* they have limited "control[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings... And third, a child's character is not as "well

1

formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievable depravity." Emphasis supplied.

*Roper* at 569-70. The United States Sentencing Commission (USSC) adopts these findings:

> The contribution that neuroscience has made to the study of youthful offending is significant and continues to evolve… People at different stages of these processes have different brain structures and functions compared to people who have fully developed brains.

*Youthful Offenders in the Federal System*, USSC (2017)[1] at 6. Dr. Eric Goldsmith noted that Josue's not fully developed brain was further impeded by his marihuana consumption since age 12:

> The scientific literature has now rapidly demonstrated the negative effects of cannabis on the adult developing brain, which is particularly vulnerable from lasting damage from marihuana use. It has been repeatedly demonstrated that adolescents who use large quantities of cannabis have poorer school and psychological functioning with lowered IQ score, problems in self-control, and diminished impulse control. Most significantly, for adolescents the frontal cortex has not fully developed. It has been shown that the use of large quantities of cannabis is toxic to the developing frontal cortex resulting in problems with planning, judgement, decision, and personality.

Goldsmith Report ("GR") at page 3 is attached as Exh. A.

In addition, the life sentence recommendation makes no sense as a practicable matter. Should Josue satisfy his life sentence, he will be deported back to his native country El Salvador after the public expenditure of more than $1 million dollars which we will hereafter demonstrate at 5.

**A. JOSUE'S BACKGROUND**

Josue never had a father. According to his mother, Vilma, his father abandoned her when she was three months pregnant and she never married. When Josue was four months old, he was left to the care of Angella Portillo, Vilma's mother, while Vilma worked as a "in-home cleaner in another town…she would return home every 2 months, only for the weekend… she would spend

---

[1] See: https://www.ussc.gov/research/research-reports/youthful-offenders-federal-system

her weekends selling table clothes and did not spend quality time with her children as she would have liked to. [Vilma] acknowledges her mother [Angella] to be Josue's mother."[2]

When Josue was three years old, his mother Vilma left him with 68-year Angella as Vilma smuggle herself into the U.S. When he was 8, Josue became defiant "he would go off with his friends who smoked cigarettes and marihuana and they seemed to have influence over him."[3] Since 12, Josue would come "home drunk and smelling like marijuana." When Josue reached 14 his mother arranged to have him smuggled into the U.S. "in hopes of him doing better." Exh. B at 1.

Josue, with the aid of a paid "coyote," traveled across Mexico to Mc Callen, Texas where he was met by U.S. Border Control agents as an unaccompanied minor. The agents notified Vilma and transported him to a detention facility in the Bronx where he was released to live with his mother in Central Islip. During the travel Josue almost suffocated to death at the bottom of a cargo trailer stacked with others seeking illegal entry into the U.S. The episode was revealed by Josue during the PINS interviews. Exh. B at 3-4.

From the start, Josue and his mother had a "strain[ed] relationship." Exh. B at 1. He was now living with her boyfriend Jose Diaz, their daughter Genesis (6years old) and members of the Diaz family. He became unsupervised. For example, there were occasions where Vilma found Josue not at home when she returned from her night job at 2:00AM. Exh.B at 4. Dr. Goldsmith then reports:

> Mr. Portillo says he joined MS-13 approximately one month after arriving in the U.S. Mr. Portillo provided several reasons for joining MS-13. When he first arrived in Central Islip, he describes feeling uncomfortably estranged from his mother. He says he "did not know

---

[2] Ehx.B, Community Reinvestment Report (CRR) at 3-4. The CRR, reflects therapists interviews of Josue and his mother as a "person in need of supervision (PINS)."
[3] Exh.A at 3

3

her", it was weird." He reports feeling more at ease with the other youths from El Salvador who were in the MS-13 gang. He reported that he joined the gang because he had a desire for respect, and he believed that the people in his area in the U.S. had a respect for the gang members, sighting the fact that the MS-13 gang is prominent in popular culture and in the news. He also stated that he thought that the gang would allow him easier access to friends, women and marijuana, which he had been using regularly since his arrival in the U.S.

Exh. A at 5.

**B. JOSUE'S BEHAVIOR WAS PREDICTABLE**

In 1995 -- six years before Josue was born -- Patrick F. Fagan, PhD, a senior research fellow for The Heritage Foundation, published an article: "THE REAL ROOT CAUSES OF VIOLENT CRIME: THE BREAKDOWN OF MARIAGE, FAMILY AND COMMUNITY." [4]

Two key excerpts apply to Josue:

> *Most delinquents are children who have been abandoned by their fathers.* They are often deprived of love and affection they need from their mother. Inconsistent parenting, family turmoil, and multiple other stresses…that flow from disagreements compound the rejection of these children by these parents many of whom become criminals during childhood. With all these factors working against the child's normal development, by age five the future criminal already will tend to be aggressive, hostile and hyperactive. *Four fifths of children destined to be criminals will be "antisocial" by 11 years of age and full two thirds of antisocial five-year olds will be delinquent by age 15.* Emphasis supplied.

at 6.

The article further notes:

> *If a child's emotional attachment to his mother is disrupted during the first few years*, permanent harm can be done to his capacity for emotional attachment to others…Separation from the mother, especially between six months and three years of age, can lead to long lasting negative effects on behavior and emotional development. *Severe maternal deprivation is a critical ingredient of juvenile delinquency.* Emphasis supplied.

---

[4] See: https://www.heritage.org/crime-and-justice/report/the-real-root-causes-violent-crime-the-breakdown-marriage-family-and

4

at 12-13.

## C. THE IMPACT OF A LIFE SENTENCE

For Josue a life sentence means exactly what it says. There is no provision for parole or good time credit.[5] For statistical purposes, the USSC uses 470 months (39 years,3mos.)[6] to measure a life sentence which would mean that Josue might satisfy his life sentence at 56 years of age. The public cost of his incarceration will exceed $1 million dollars. One decade alone costs a minimum of $350,000[7] without factoring inflation and the additional cost of reformation programs contemplated by the $50 billion committed under the recently enacted the First Step Act. After this enormous public investment, Josue will be deported to his native El Salvador. He will never present a danger to the U.S. community. None of these factors have been taken into account by the department's life sentence recommendation.

## D. MOTION FOR DOWNWARD DEPARTURE

Pursuant to U.S. Sentencing Guideline 5K2.0, we urged the Court to downwardly depart from the Level 43 as determined by the PSR upon the ground that the Offense Level does not adequately take into account Josue's age and other offender characteristics which distinguish his case from a typical case under the guidelines, as authorized by section 5H1.1 Age (Policy Statement). The PSR at ¶¶ 121-22 agrees: " The defendant's very young age may be a potential grounds for departure, As detailed herein, the defendant had no knowledge of his father, a

---

[5] 18 U.S.C. 3624 (b)
[6] See: *Life Sentences in the Federal System,* (USSC 2015) at fn 52: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.p
[7] See: BOP Federal Register: inmate $34,702 annual cost for fiscal 2016-17: https://www.federalregister.gov/documents/2018/04/30/2018-09062/annual-determination-of-average-cost-o

5

limited relationship with his mother, and early exposure to gang lifestyle. The circumstances may be considered at sentence, should the Court find compelling".

The 2017 USSC report *"Youthful Offenders in the Federal System"* illustrates how difficult it is to determine a "typical case" under the guidelines. For the period 2010-15, a survey at page 48 shows that only *one* juvenile was sentenced to life imprisonment at 18 years of age As far as we have been able to ascertain, no defendant has ever been sentence to life at 17 for murder committed at 15.

Since 2015, we have identified only two cases where a life sentence was imposed upon juveniles. In *United States v. Briones*, 890 Fd3d 911 (9 Cir.2018), *Briones*, at 17, was a gang leader who committed a series of violent crimes including shooting a store clerk dead during the course of a gang-robbery, twice firebombing family-occupied premises, and attempting to escape from jail, kill the judge and prosecutors and blow up the local police department. In *United States v. Pete*, 819 F3d 1121 (9 Cir 2016), *Pete*, at 16, together with two adult companions picked up hitchhiker, Charlotte Brown, raped her and then they stoned her to death. Pete was sentenced to life imprisonment. The PSR showed Pete continued to committ crimes until he was 22 years old. His life sentence was reaffirmed by the Ninth Circuit after a remand to the district court for a re-sentencing to consider an evaluation by a forensic psychiatrist. *Pete*, 740 Fed Appx. 151. (2018)

Other than the murder for which Josue stands convicted, there is no evidence which indicates that Josue has a propensity to commit crimes of violence. To the contrary, Dr. Goldsmith attributes Josue's participation in the murders to a destabilizing period in his life based upon several factors which need not be repeated here. Prior to the murders, Josue appeared to be "a very resilient adolescent who desires to do well and improve his school behavior and

6

drug use" despite being subject to gang influence. Exh.B at 4-5. Even in these proceedings Josue's immaturity has not dissipated, as confirmed by Dr. Goldsmith: "This immaturity is manifested in his difficulty understanding or expressing his motivations for his behaviors (such as the decision to join MS-13), the superficially with which he views his current situation, and the self-involved way in which he frames the events leading to his arrest, and his difficulty in considering ways in which his actions are likely to impact others.". Exh.A at 10. This perhaps explains why the Guidelines and the principles promulgated by the U.S. Supreme Court recognized "Age" as a justifiable consideration for downward departure.

Finally we note that once confronted by the lead FBI case agent when he was incarcerated in the Virginia detention center for illegal aliens, Josue promptly confessed without hesitation or any effort to deny his involvement or obstruct the investigation in any way. Attached hereto as Exh. C is Josue's apology to the victim's (Michael Lopez) family and his readiness to accept a reasonable sentence.

### E. APPLYING THE 18 U.S.C. 3553 (a) FACTORS

To determine what sentence is "sufficient but not greater than necessary," we offer the following observations with respect to the four key elements the Court must consider as stated by the U.S. Supreme Court: "retribution, deterrence, incapacitation and rehabilitation," *Tapia v. United States*, 564 U.S. 319, 325 (2011).

Retribution has been called a "barbaric" concept but necessary to assure the community that the Courts also serve their interests. *United States v. Blarek*, 7 Fed. Supp 2d 192, 210 (EDNY 1998) Yet the U.S. Supreme Court does not consider retribution or deterrence compelling factors in juvenile sentencing because "the same characteristics that render juveniles

less culpable than adults -- their immaturity, recklessness, and impetuosity -- make them less likely to consider potential punishment." *Montgomery v. Louisiana,* at 733.

Incapacitation, upon which the Probation Department's life recommendation rests, is also not a favored factor because it assumes incorrigibility. To the contrary, the Supreme Court found that: "ordinary adolescent development diminishes the likelihood that a juvenile offender 'forever will be a danger to society.'" *Montgomery* at 733.

That leaves Rehabilitation as the most compelling factor to be considered. The Supreme Court emphasized this factor in *Montgomery* at 736-37: *Hyde Montgomery*, at 17, shot and killed a deputy sheriff in cold blood. He was sentenced to life imprisonment without parole. 46 years later the Suprema Court vacated his sentence as unconstitutional. The Court was impressed by *Montgomery*'s rehabilitation efforts "knowing he was condemned to die in prison," and noted that prisoners like *Montgomery* "must be given the opportunity to show their crime did not reflect irreparable corruption and if it did not, their hope for some years of life outside prison walls must be restored. *Montgomery* at 736-37.

**F. DESIGNATION**

After consulting with designation advisor, Joel Sickler, of Justice Advocacy Group LLP, coupled with the express consent of Mr. Portillo, we request the Court to recommend that Josue be designated to serve his sentence at USP Coleman, located near Orlando, Fl. which is noted as a preferred facility for young inmates and free of MS-13 influence. His mother Vilma cannot be expected to visit him with any regularity. She made but one visit to the Suffolk County Jail where she was discouraged from further visits because of her questionable status as an unregistered alien in the U.S.

# CONCLUSION

The Probation Department's recommendation of life imprisonment should be rejected upon the ground that it violates all cardinal principles of juvenile sentencing jurisprudence, and, in the alternative, the Court should impose a reasonable sentence which will afford Josue the opportunity to be reformed into a productive adult in anticipation of his deportation to his native country El Salvador. Finally, we request that the judgment contain language to following effect:

> The court strongly recommends the defendant be designated to an institution where the defendant will be safe given his age. The court understands the defendant would like to be housed (if high-security, his likely classification) at USP Coleman in FL. The court is informed it is considered a drop-out yard and may be safe for a young defendant who no longer wishes to be affiliated with his organized, criminal gang. Further, the court's preference if possible would be to house this defendant away of others with gang ties to the organization he once belonged.

Dated: Melville, New York
January 17, 2019

JOSEPH W. RYAN, JR., P.C

By: _____
JOSEPH W. RYAN, JR. (2408)
*Attorneys for Defendant*
JOSUE PORTILLO
MELVILLE LAW CENTER
225 OLD COUNTRY ROAD
MELVILLE, NY 11747
516 629 4896
joeryanlaw@earthlink.net

TO: Honorable Richard Donoghue
United States Attorney
610 Federal Plaza
Central Islip, NY 11722
Attention: AUSA Paul G. Scotti

USPO Lisa Langone