# EHIBIT A

# DR. GOLDSMITH REPORT

# Eric Goldsmith, M.D., PC

The American Board of
Psychiatry and Neurology
Diplomate in Psychiatry
With Certification in the
Subspecialty of Forensic
Psychiatry

420 Madison Ave, Suite 801
New York, NY 10017
Tel: 212-486-2754
Fax: 212-486-2758
Eric.Goldsmith@gmail.com

## PSYCHIATRIC REPORT

**EXAMINEE:** JOSUE PORTILLO
**INDICTMENT No.:** US v. Portillo, 17-366(JB)
**DATE OF BIRTH:** MAY 1ST, 2001
**DATE OF REPORT:** JUNE 22, 2018

**PURPOSE OF EVALUATION:** Joseph W. Ryan, Jr., attorney for the defendant, Josue Portillo requested that I conduct a psychiatric evaluation of his client. Josue Portillo, currently a 17-year-old male, was 15 years, 11 months when reportedly as a member of the MS-13 gang he participated in the April 11, 2017 murders of Justin Liivicura, Michael Lopez, Jorge Tigre and Jefferson Villalobos. Mr. Portillo has been charged with Racketeering, Racketeering Conspiracy, Conspiracy to Murder Rival Gang Members, and the "April 11 Murders". The Government has made a motion to the Court to transfer Josue Portillo to District Court for Prosecution as an Adult.

The purpose of this evaluation is to conduct a comprehensive psychiatric assessment, provide a diagnostic impression, and to assess the following factors relevant to the standards by which transfer to adult status is considered in the interest of justice, namely (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. See 18 U.S.C. § 5032; Nelson I, 68 F.3d at 588.

**SOURCES OF INFORMATION:**
- Interview with Mr. Portillo at the Suffolk County Jail on April 11, 2018, for approximately 4.5 hours. The interview was conducted in the presence of his attorney, Joseph W. Ryan, Jr., with the assistance of Spanish speaking interpreter Jose Carlos Venant.
- Review of records from the State of New York, Suffolk County Family Court, Docket G-00188-16 concerning Mr. Portillo's guardianship status, petitioning for his mother to be appointed his sole guardian.
- Review of Central Islip Union Free School District Records from September 2015–June 2017.
- Review of Community Reinvestment Report dated February 14, 2017.
- Review of Government's Motion and Memorandum of Law in Support of Motion to Transfer Josue Portillo to District Court for Prosecution as an Adult, prepared by Richard P. Donoghue, U.S. Attorney, Eastern District of New York.
- Review of Suffolk County Probation Department File.

- Review of U.S. v. Juvenile Male, 269 F. Supp. 3d 29.
- Review of U.S. v. Juvenile Female, June 11, 2018 memorandum and order, 17-CR-362 (J.F.B.).
- Review of November 22, 2016 in U.S. District Judge Paul A. Engelmayer decision, U.S. v. C.F., 225 F. Supp. 3d 175.
- Review of various correspondences from Joseph W. Ryan, Jr.
- Telephone interview with Josue Portillo's mother, Vilma Portillo on May 16, 2018 with the assistance of Spanish-speaking interpreter Jose Carolos Venant.
- Face-to-face interview with Vilma Portillo on June 16, 2018, at the office of Joseph W. Ryan, Jr. for approximately 3.0 hours. The interview was conducted in the presence of Joseph W. Ryan, Jr. with the assistance of Spanish-speaking interpreter, Jose Carlos Venant.

**CONFIDENTIALITY:** Mr. Portillo was informed that the purpose of the evaluation was to provide a psychiatric assessment to his Attorney, the U.S. Attorney and the Court. Mr. Portillo understood that information about our meeting was not confidential to that extent. He understood that a treatment relationship was not being established.

**BACKGROUND:** Mr. Portillo was born in Lolotiquillo, a small town in El Salvador. He describes the community he grew up in as predominantly rural, with a small population. His parents were unmarried, and his father left before Mr. Portillo was born. Mr. Portillo has never met his father or had any form of communication with him. Mr. Portillo has one older sister and one younger sister. When Mr. Portillo was 3 years old, his mother emigrated to the United States in search of better job opportunities. She left Mr. Portillo and his older sister in the care of his maternal grandmother, who supported them by farming and selling a blood supplement made from roots. Between the ages of 3 and 14, Mr. Portillo did not see his mother, although they occasionally spoke over the phone. However, he reports that those conversation were relatively infrequent and brief, as he felt "embarrassed" by talking to her too long.

Vilma Portillo reports to this examiner at the June 6, 2018 interview, that she gave birth to Josue at the age of 23. Three years earlier, she had given birth to Josue's sister, Cyndy. Neither Josue or Cyndy had relationships with their fathers. Vilma Portillo reports that Josue's father abandoned her while she was three months pregnant. Vilma Portillo reports that she entrusted the child-rearing duties of her two children to her then 60+-year-old mother, Angella.

Vilma Portillo reports that she grew up in poverty. Her mother worked selling prepared hot foods and washing clothes. Her father died when she was two years old. Vilma attended school until the third grade. She says she can read a little bit of Spanish. After leaving school, she went to work. By the time she entered her teenage years, she traveled to a nearby town to work as a house cleaner. When Josue was 3-year-old and Cindy 5, Ms. Portillo left San Salvador and came to America. Her mother, Angella, was 68 years old at that time and took over total child-rearing responsibilities. Angella also sold a root infused product in the local economy, which was supposed to help with anemia.

Vilma Portillo reports that when she arrived in the United States, she maintained contact with her children and her mother by telephone. It appears that Ms. Portillo's mother, Angella was competent and in a good state of health to parent her grandchildren. She enforced rules and was concerned about the children being exposed to negative influences and gang violence. She attended church services and brought the children with her.

Vilma Portillo reports that initially her son Josue was well behaved with his grandmother. He did not evidence early childhood oppositional defiant behaviors. He did not evidence antisocial behaviors. He followed his grandmother's directions, attended school, did well and went to Sunday church services with his grandmother and sister.

However, Vilma Portillo reports that about the age of 8, Josue was evidencing more defiant behaviors. She says her mother became concerned because he would go off with his friends who smoked cigarettes and marijuana and they seemed to have some influence over him. By his early teenage years, Josue had become more defiant of his grandmother. She knew that he was smoking marijuana. She knew that he was spending time at the soccer fields with unsavory characters.

Vilma Portillo reports that she and her mother grew increasingly concerned that Josue would end his hopes for the future and fall prey to the influences of the gang and drug culture in El Salvador. When he was 14 years old, Vilma Portillo made arrangements for Josue to come to America. Cindy remained in El Salvador with her grandmother. She continued in school and has thrived under her grandmother's parenting. Cindy has graduated high school and is planning to attend college in San Miguel, El Salvador.

Josue Portillo reported that as a child he had no history of social or behavioral difficulties. He got along well with his peers and received passing grades in his El Salvador school. He played soccer on an almost daily basis and describes this has his favorite activity.

When Mr. Portillo was 12, he says he began smoking cigarettes. He also reports that he smoked marijuana. However, he denied using marijuana regularly before coming to the U.S., in part because marijuana was not readily available to him. He also reported trying alcohol around this age but denied regular use.

When Mr. Portillo was 12, gang members started to arrive in his El Salvador community. He stated they were readily apparent because of their apparel. He identified them as members of the MS-13 gang and stated that prior to their arrival there had been no gang activity in the area that he was aware of; and that there were no other gangs, either before or after MS-13 arrived. The gang members would frequently come to the field where Mr. Portillo played soccer, and he sometimes spoke or exchanged cigarettes with them. However, he denied having any official involvement with MS-13 while in El Salvador.

After the arrival of the gangs, the area where Mr. Portillo lived became more violent. People started disappearing from the community, including someone associated with Mr. Portillo's soccer league. His cousin's husband was also killed by gang members. In addition, there were frequent altercations between the gang and the police, and Mr. Portillo reports witnessing several incidents of police brutality. He says that unlike in America, the police force in El Salvador are not to be trusted.

Around this time, Mr. Portillo describes displaying defiant behaviors towards his grandmother, ignoring her rules and spending significant amounts of time hanging out on the streets with his friends. Although he denied being a gang member at this time, he reported feeling that joining a gang was going to be inevitable, as those who didn't join were victimized. Due to his growing oppositional defiant behavior with his grandmother and the increase in violence in the area, when Mr. Portillo was 14, he says his mother and grandmother decided it would be best for him to join his mother in the United States.

Mr. Portillo's journey to the United States occurred in July and August of 2015. It was an experience Mr. Portillo describes as traumatic. He reports that during part of the trip he was transported in an unventilated shipping container that was so crowded it was impossible to stand without touching other people. At another point, the truck he was in was so crowded that there were 3 other teenagers on top of him and he felt that he couldn't breathe. He also reports having to run away from immigration officials and had to hide from them in a trough. After he crossed the border, Mr. Portillo was taken into custody by other immigration officials. He was eventually sent to the Bronx, where he was reunited with his mother.

Mr. Portillo reported that after the journey from El Salvador, he would have frequent nightmares about the trip, and would have difficulty being in hot areas, as they reminded him of the crowded conditions he had endured. However, he stated that this was no longer happening at the time of the evaluation with this writer.

On arrival to New York, Mr. Portillo stayed in a group home for approximately a month before going to stay with his mother. His mother lived in an apartment in Central Islip, Long Island with her partner Jose Diaz, Jose's grandmother, and Mr. Portillo's younger half-sister, Genesis.

Vilma Portillo reports that when Josue first lived with her in Central Islip, he appeared in good spirits and was cooperative. Josue enjoyed being taken to the soccer fields by Jose. He attended the local public school and attempted to learn. She says he did well in school during his first year, which is consistent with what is documented in the school record. Vilma Portillo reports that Josue appeared initially motivated to perform well in school. She says it was a challenge because he did not speak English, so he attended bilingual classes. Vilma Portillo reports that it was her observation that Josue had poor frustration tolerance. She says if the school was placing demands on him, which he found arduous, he would get upset and not do his work or leave the classroom.

Vilma Portillo reports that when Josue attended the Central Islip High School, things drastically changed for the worse. She reports that he would get dropped off at school in the morning but take it upon himself to leave class. His school performance deteriorated. Vilma Portillo says she was brought into school by the counselors. She reports Josue received counseling and a social worker made visits to their home. Vilma Portillo did not appreciate that at the time, her son was smoking large amounts of marijuana. She did not know that he had joined the MS-13 gang. She says however, that she was worried about him. He was not violent at home, but he was moody and withdrawn. Though, in some respects, she says she believed his problems were typical adolescent behavior.

Josue Portillo entered the 8th grade in the fall of 2015. He reported that adjusting to the new school was very difficult. The school was much larger and more crowded than he was used to. In addition, he found the academic work more difficult. The curriculum was more challenging, and he did not speak the language.

Shortly after arriving to the United States, Mr. Portillo became friendly with his cousin Azael, who had arrived in the U.S. from El Salvador about a week before Mr. Portillo. Although the cousins had known each other prior to arriving in the U.S., they hadn't been close. In the U.S., however, they began spending significant time together. Azael had been an M.S.-13 gang member prior his immigration and he introduced Mr. Portillo to several gang members.

Mr. Portillo says he joined MS-13 approximately a month after arriving in the U.S. Mr. Portillo provided several reasons explaining his motivation for joining MS-13. When he first arrived in Central Islip, he describes feeling uncomfortably estranged from his mother. He says he "did not know her", "it was weird." He reports feeling more at ease with the other youths from El Salvador who were in the MS-13 gang. He reported that he joined the gang because he had a desire for respect, and he believed that the people in his area in the U.S. had a respect for the gang members, sighting the fact that the MS-13 gang is prominent in popular culture and the news. He also stated that he thought that the gang would allow him easier access to friends, women, and marijuana, which he had begun using with increasing regularity since his arrival to the U.S.

Beginning in the latter half of the 8th grade, Mr. Portillo began to receive disciplinary action in school for disruptive behavior and truancy. On 4/25/16, he received 1 day of in school suspension (ISS), and on 6/08/16, he received 2 days of off-site suspension (OSS). Although Mr. Portillo performed adequately in most school subjects, he needed to retake math and English in summer school after completing the 8th grade. He passed both classes.

In the summer of 2016, when Mr. Portillo was between 8th grade and high school, he says he was approached outside a 7-Eleven by the victims of the alleged offense, who were members of a rival gang. They asked him if he were a member of MS-13 and threatened to beat him up if he were. Mr. Portillo denied being a member of MS-13 and escaped the situation unscathed. He told Azael about the incident, and they found out the identities of the men through social media. However, they decided not to pursue the matter further at that time.

When Mr. Portillo entered the 9th grade at Central Islip High School in September of 2016 his pattern of truancy and disruptive behavior increased significantly and escalated throughout the course of the year. On 9/19/16, Mr. Portillo received In School Suspension (ISS) for one day, after he was truant and refused to follow the instructions of a school security officer. On 10/24/16 he received 5 days of ISS for ongoing behavioral issues. In total, by 12/05/16, he had 20 full days truancy and 12 days of partial truancy.

Because of his persistent truancy, deteriorated school performance and cannabis use in October of 2016, Mr. Portillo was referred to the Person in Need of Supervision (PINS) program, and his case was officially opened on 12/06/16. Through the Community Reinvestment Program (CRP), Hope for Youth was contracted to work with Mr. Portillo, and he was assigned a Case Manager, Stephanie Rivera. However, it does not appear that these interventions made a significant impact. In the first academic quarter of 2016, Mr. Portillo failed 4 of his 10 classes. Available records indicate that these grades were a reflection of poor attendance, rather than of academic difficulty.

On 12/14/16 Mr. Portillo was caught smoking marijuana on school property. At that time, he received 5 days of offsite supervision (OSS). He received OSS again on or around 01/31/18 for 5 days after fleeing school security officers. On 4/03/17, he received OSS again for 5 days, after he was insubordinate, cutting class, and being in an unauthorized area. Due to spring break, this suspension lasted until 4/18/17, and he received OSS again on the day after he returned, 04/19/17, for 5 days for insubordination, and entering the female bathroom. These episodes of offsite suspension were interspersed with several days of ISS, and on 5/22/17 he received OSS for 5 days due to, among other things, refusing to attend ISS. By this time, the "April 11 Murders" had already occurred.

School records indicate that in addition to Mr. Portillo's frequent unexcused absences, he was also frequently disruptive and oppositional in class. He would often not participate in the assigned activity, would yell and talk back to the teacher, and on occasion would throw things.

The records also indicate that the school made numerous attempts to work with Mr. Portillo's mother to address his problematic behavior. In addition to requesting frequent parent-teacher conferences, they had numerous phone calls and discussion about ways in which she could attempt to implement more discipline in the household. These records indicate that Mr. Portillo's mother conveyed to his teachers her frustration with her son's behavior and her difficulty exercising any sort of control over his behaviors. For instance, she would drop him off at school every day, but Mr. Portillo would immediately sneak out and go hang out with friends. CRP counselling records indicate that part of why she had difficulty controlling Mr. Portillo was their distant relationship and her lack of involvement in his life up until that point. It appears that Vilma Portillo, an uneducated woman who had no experience in parenting a high school age student, lacked the necessary judgement and skills to successfully supervise and advocate for her son.

When interviewed by this examiner, Mr. Portillo reported that during his 9th grade year he was frequently bored by school and preferred to spend his time smoking marijuana and hanging out with girls and his friends in MS-13. He reported that he was smoking marijuana on a daily basis. He would always smoke in the morning and would frequently smoke in the evening. At times he would stay out late with his friends and refuse to follow his mother's instructions on when to return home. He stated that at that time he had already made the decision that he was going to leave school at the earliest opportunity and get a job. Vilma Portillo reports that her son had repeatedly stated that he wanted to drop out of school and work.

Mr. Portillo reported that during his 9th grade year, his rank in MS-13 was a "paro," the lowest rank in the gang. According to Mr. Portillo, in order to be promoted in MS-13, it is necessary to kill a member of a rival gang. However, sometime during the course of that year, he told a higher-ranking MS-13 member about his altercation with the rival gang members outside the 7-Eleven. Because of that altercation, and another incident involving the victims and a high-ranking member of the local chapter of MS-13, a plan was made to assassinate these rivals, with the understanding that Mr. Portillo would be promoted in MS-13 if he participated.

**LEGAL HISTORY:** Mr. Portillo had one prior arrest for a minor crime, when in early 2017, when he was found to be loitering in an abandoned building.

**PSYCHIATRIC HISTORY:** Mr. Portillo received talk therapy through the CRP following his designation as a PINS. He and his mother reported that he has never received a psychiatric diagnosis and has never taken psychiatric medication.

**SUBSTANCE ABUSE PROBLEM:** Mr. Portillo began smoking marijuana at age 12. By age 14, he was using large amounts of cannabis on a daily basis. He has no history of abusing alcohol or other illicit substances.

**MEDICAL AND DEVELOPEMENTAL HISTORY:** According to Mr. Portillo's mother, he was born on time and without complications. He met all developmental milestones on time and did not experience any developmental delays. He has no significant medical history.

**MENTAL STATUS EXAMINATION:** At the time of the evaluation with this writer, Mr. Portillo was a 16-year-old male, who appeared his stated age. He was calm and cooperative with the evaluation and appeared to make a good effort to be honest and forthcoming. His attention and concentration were adequate, and there was no indication of any cognitive limitations. He spoke fluent Spanish, and the evaluation was conducted with the aid of an interpreter, although it did appear that Mr. Portillo understood many of the questions asked of him. His thought process appeared organized, and there was no indication of any sort of thought disorder or hallucinations. He reported some recent periods of depression and thoughts about wanting to be dead but denied any of these at the time of the evaluation. During the course of the evaluation, Mr. Portillo displayed very little emotional range, and his facial expressions and tone were the same when discussing both good and bad memories. Although there was no evidence of cognitive

limitations, Mr. Portillo gave the impression of being immature for his age. His manner did not indicate a full appreciation of the gravity of the charges against him, or of the life altering implications of those charges. He also did not appear to have insight into his own motivations or behaviors.

**DIAGNOSIS:** Oppositional Defiant Disorder.
Cannabis Use Disorder.
Adolescent Anti-Social Behavior.

**FORMULATION:** Mr. Portillo is a 17-year-old male member of the MS-13 gang. He is accused of gang related crimes, including participating in the fatal stabbing of four rival gang members. Mr. Portillo was 15 years 11 months old at the time of the "April 11 Murders." During the evaluation of Mr. Portillo on 4/11/18, there was no indication of the presence of any major mental illness. In addition, Mr. Portillo, Mr. Portillo's mother and available school and therapy records agree that Mr. Portillo has no history of a major psychiatric disorder.

However, beginning at the age of 8, while living with his grandmother and older sister in El Salvador, Josue Portillo began to evidence oppositional defiant behaviors which continued throughout his adolescence and up until his arrest. Josue Portillo has evidenced difficulty with the self-control of his emotions and behaviors. He can be easily annoyed, and actively defies or refuses to comply with authority figures, meeting the DSM-5 diagnostic criteria for Oppositional Defiant Disorder.

Most significantly, Josue Portillo began using marijuana at the age of 12 and by age 14, his use escalated to daily large quantities. He meets DSM-5 diagnostic criteria for Cannabis Use Disorder.

The scientific literature has now rapidly demonstrated the negative effects of cannabis on the adolescent developing brain, which is particularly vulnerable to lasting damage from marijuana use. It has repeatedly been demonstrated that adolescents who use large quantities of cannabis have poorer school and psychological functioning with lowered IQ scores, problems in self-control and diminished impulse control. Most significantly, for adolescents the frontal cortex has not fully developed. It has been shown that use of large quantities of cannabis in adolescents is toxic to the developing frontal cortex resulting in problems with planning, judgment, decision making and personality. Adolescents who use large quantities of marijuana are likely to show these executive function problems.

According to United States v. Nelson 68 F.3d 583, 588 (2d Cir. 1995), when evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. Below I will address those factors that can be spoken of from a psychiatric perspective.

**Mr. Portillo's Age and Social Background:** Mr. Portillo is a 17-year-old male, born Lolotiquillo, a small town in El Salvador. He was raised primarily by what appears to be a competent grandmother after he was left by both parents at an early age. He never knew his father, and his mother moved to the United States when he was 3 years old. His mother, Vilma Portillo was raised in poverty, is uneducated and lacked the necessary skills to adequately parent her adolescent son. Although he and his mother communicated sporadically between her emigration and his at the age of 14, they were not close, and Mr. Portillo reports that he has had difficulty in the past relating to her as a maternal figure. He felt awkward in her presence when he came to the United States. Mr. Portillo's grandfather died when Vilma Portillo was relatively young, and it does not appear that Josue Portillo had any significant male role models during his formative years. Mr. Portillo reports that his family had limited financial means, as evidenced by his mother leaving her small children in order to seek out economic opportunities. His grandmother supported him and his older sister primarily by farming and selling root medicine. The transition from rural El Salvador to New York appears to have been a difficult and destabilizing one for Mr. Portillo. He endured significant trauma during the journey, and had a hard time adjusting to the crowds and academics in his new school. In addition, the lack of a relationship with his mother left him more isolated and with few sources of support in a country where he did not speak the language. This destabilization left him vulnerable to dangerous influences, particularly in the form of an older cousin, who was already a member of the MS-13 gang and had also immigrated to the U.S. from Lolotiquillo. Although he denies any involvement in gangs prior to coming to the U.S., within a month of arrival he had joined MS-13. Mr. Portillo maintains that he approached MS-13 representatives and expressed interest. However, based on the narrative he relates, it appears that the gang actively recruited him, initially through his cousin, who introduced Mr. Portillo to other members, and also through inducements such as access to marijuana and women. Feeling alienated in his home with his mother, Josue Portillo found the camaraderie with other adolescents from El Salvador who were in the MS-13 gang very appealing.

**The Nature of the Offense Alleged:** It is alleged that Mr. Portillo participated in a plan to lure 5 members of a rival gang into the woods, where he and other members of the MS-13 gang stabbed 4 of them to death in retaliation for threats the victims had made. He is also accused of other gang related crimes.

**The Nature and Extent of Any Prior Delinquency Record:** Mr. Portillo had one previous arrest, in the winter prior to his arrest, when he was found trespassing in an abandoned building. In addition, he had an extensive history of truancy from school, received extensive disciplinary actions in the form of numerous suspensions, and was once caught smoking marijuana on school property.

**Mr. Portillo's Present Psychological Maturity and Intellectual Development:** Mr. Portillo does not appear to have any intellectual limitations. Although his academic records indicate he has failed several classes in the past, these failures appear to be the result of poor attendance and effort rather than intellectual limitations. He appears to have met all of his developmental milestones within a normal time frame. He is currently not suffering from any appreciable sign of major mental illness. Although he does admit to some anxiety about his future and some passive thoughts about wishing to be dead, these are of an intensity expectable given his current legal situation. In fact, during the evaluation with this writer, Mr. Portillo seemed less anxious and distressed than would usually be expected, given the gravity of his charges. This is potentially due to the fact that he appears to be immature for his age. This immaturity is manifested in his difficulty understanding or expressing his motivations for his behaviors (such as the decision to join MS-13), the superficiality with which he views his current situation, and the self-involved way in which he frames the events leading to his arrest, and his difficulty in considering the ways in which his actions are likely to impact others. However, Josue Portillo consistently used large quantities of marijuana. Understanding the effects of large quantities of cannabis on the developing adolescent frontal cortex, he likely has executive function problems involving judgement and decision making.

**Mr. Portillo's Response to Past Treatment Efforts and the Nature of those Efforts:** Mr. Portillo engaged in a brief course of therapy with his CRP counselor in the months leading up to his arrest. Records indicate that during this time, Mr. Portillo concealed the extent of his gang involvement from his therapist. There is no indication that Mr. Portillo was either benefitted or harmed by this intervention.

**Available Programs designed to treat the Juvenile's behavior:** Mr. Portillo does not evidence psychiatric or intellectual limitations that would prevent him from being able to successfully engage in a residential program for juveniles. A juvenile residential treatment program is the ideal choice of treatment environment for Josue Portillo. These programs are able to manage behavioral and substance abuse problems. Josue Portillo requires intensive substance abuse treatment to assist him in achieving lasting sobriety. The components of his program should include modules of psychoeducation, relapse prevention, and therapeutic elements of motivational interviewing techniques. Josue Portillo requires cognitive behavioral psychotherapy to address his oppositional defiant and antisocial behaviors. Behavioral interventions will over time extinguish the unwanted problematic behaviors replacing them with prosocial behaviors. In addition, education and vocational training services available at a juvenile residential treatment facility will support emotional and psychological growth, providing him with the positive experience of productivity.

If Josue Portillo is able to successfully complete the treatment, educational and vocational components of juvenile residential treatment program, his risk of recidivism would be significantly reduced.

Respectfully submitted,

Eric Goldsmith, M.D., PC
Diplomate in Psychiatry with Certification in the Subspecialty of Forensic Psychiatry, A.B.P.N.
Clinical Assistant Professor of Psychiatry, New York University School of Medicine
EG/pm