

U.S. Department of Justice

United States Attorney
Eastern District of New York

JJD/PGS
F. #2017R01167

610 Federal Plaza
Central Islip, New York 11722

March 18, 2019

<u>By Hand and ECF</u>
The Honorable Joseph F. Bianco
United States District Judge
United States District Court
Eastern District of New York
1040 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Josue Portillo
      <u>Criminal Docket No. 17-366 (S-1)(JFB)</u>

Dear Judge Bianco:

  On August 20, 2018, the defendant Josue Portillo, also known as "Curioso" and "Sparky," a member of La Mara Salvatrucha, also known as the MS-13, pleaded guilty to Racketeering, including racketeering predicate acts of conspiracy to murder rival gang members, the murder of Justin Llivicura, the murder of Michael Lopez, the murder of Jorge Tigre, and the murder of Jefferson Villalobos, who were killed on April 11, 2017 by the defendant and numerous co-conspirators. The defendant is scheduled to be sentenced on March 22, 2019. According to the Probation Department, the defendant's total offense level is 43 and he should be sentenced within Criminal History Category I, which together yield an advisory Guidelines sentence of life. Pre-Sentence Investigation Report ("PSR") at ¶ 107. The government and defendant concur with this calculation.[1]

  On January 17, 2019, the defendant submitted a sentencing memorandum ("Def. Mem.") wherein he argued that the Court should reject the Probation Department's recommendation of a life sentence and impose a "reasonable sentence" that would allow the

---

[1] The defendant elected to plead guilty without a plea agreement with the government. However, the Guidelines calculation in the PSR is consistent with an estimate provided by the government in an August 15, 2018 letter to the Court. Moreover, while the defendant requests a downward departure, he does not contest the accuracy of the Guidelines calculation in the PSR. Def. Mem. at 5.

defendant an opportunity to be reformed before being deported to El Salvador.[2]  Def. Mem. at 9.  For the reasons set forth below and in the government's supplemental submission, the government respectfully submits that, after considering the defendant's advisory Guidelines sentence of life, in conjunction with the factors set forth in 18 U.S.C. § 3553(a) and Miller v. Alabama, 132 S.Ct. 2455 (2012), in particular, the seriousness of the offense, the brutal, execution-style murders of four young men, the need for deterrence, and the need for the sentence to protect the public from further crimes of this defendant, the Court should sentence the defendant to 60 years in prison.

## I.   Background

As set forth in the PSR, the defendant's arrest and conviction resulted from an investigation by the government and Federal Bureau of Investigation's Long Island Gang Task Force ("Task Force") into a series of violent crimes committed by members of La Mara Salvatrucha, also known as the MS-13 street gang (hereinafter, the "MS-13").  PSR at ¶¶ 8-23.  As set forth in the PSR, the defendant, who is a self-admitted member of the Leeward Locos Salvatruchas ("Leeward") clique of the MS-13, and numerous other MS-13 gang members carried out the April 11, 2017 murders of Llivicura, Lopez, Tigre and Villalobos (the "April 11 Murders").  Id.

On April 12, 2017, at approximately 8:00 p.m., members of the Suffolk County Police Department ("SCPD") responded to a wooded area adjacent to the Central Islip Recreational Center, which is located at 555 Clayton Street, Central Islip, New York 11722 (the "Recreation Center"), and found the bodies of Llivicura, Lopez, Tigre and Villalobos piled together.  All four victims had significant sharp-force and blunt-force injuries covering their bodies.

Subsequent investigation determined that Llivicura, Lopez, Tigre and Villalobos were lured to their death and murdered by the defendant and more than a dozen other members and associates of the MS-13 because the MS-13 suspected that the victims and a fifth individual, who escaped ("Witness-1") were members of the rival 18th Street gang and had represented themselves to be MS-13 members, when, in fact, they were not.  Several months prior to the murders, the defendant had an altercation at a 7-11 convenience store with Witness-1 and several of the other victims.  Thereafter, in the weeks and days leading up to the April 11 Murders, the defendant was involved in numerous discussions and meetings where photographs of Witness-1 flashing MS-13 hand signs were circulated, and the defendant and his co-conspirators agreed to murder Witness-1.  The defendant and the other MS-13 members

---

[2] The defendant filed an additional, sealed filing that highlighted another aspect of his personal circumstances that he argues is relevant to sentencing.  Concurrent with this memorandum, the government is submitting a supplemental filing under seal that addresses that argument by the defendant.

2

devised a plan, wherein they directed two female MS-13 associates to lure the victims to an isolated area where the MS-13 members would attack and kill them.

On April 11, 2017, the two female co-conspirators contacted Witness-1 and invited him to go to the Recreation Center with them under the guise of smoking marijuana. Witness-1, who was with the four victims, invited them to join the group. That same evening, the defendant and numerous other MS-13 members and associates gathered in the woods adjacent to the Recreation Center and prepared for the murders. The MS-13 members and associates discussed the plan, divided up the knives and machetes, made clubs out of tree limbs, and waited for the victims to arrive. During this time, the defendant took a lead role in coordinating the attack, staying in close contact, by text message, with the two female co-conspirators, who provided the defendant with updates as to the time of their arrival with the intended victims and their location in the woods, which the defendant relayed to the other MS-13 members to determine the timing of the attack. The defendant also contacted the leaders of the Leeward clique from whom he sought and obtained permission to carry out the murders.

Once Witness-1, the four victims, and the two female co-conspirators arrived in the woods, they began smoking marijuana near a fallen tree. Based on the location information that the defendant received from the female co-conspirators, the defendant and the other MS-13 members and associates divided into groups, surrounded the victims, and ordered them not to move and to get on the ground. Witness-1 immediately jumped over a fence and escaped. The remaining victims were surrounded by the defendant and the other MS-13 members, and killed in an ensuing frenzy of violence. The defendant savagely attacked the victims using a machete, the other MS-13 members also used machetes, as well as an axe, knives and tree limbs.

After killing the four victims, the MS-13 members, who were concerned because Witness-1 had escaped and might call the police, dragged the victims' bodies a short distance, left them in a pile, and fled the scene. The MS-13 members planned on returning to the scene to bury the bodies the following evening, but the SCPD discovered the victims' bodies before the MS-13 members had an opportunity to do so.

Due to the fact that he was 15 years and 11 months old at the time of the April 11 Murders, the defendant was charged by sealed information in connection with the April 11 Murders in federal court in the Eastern District of New York ("EDNY") and other co-conspirators have been indicted in connection with these murders by a federal grand jury sitting in the EDNY, United States v. Amaya-Sanchez, et al., 16-CR-403 (JFB), or charged by sealed juvenile informations. On July 12, 2017, an arrest warrant was issued for the defendant out of the EDNY, based on the aforementioned information, and the defendant was taken into custody at an immigration detention facility in Virginia by members of the Task Force. Once in Task Force custody, the defendant waived his Miranda rights and agreed to be interviewed by agents and admitted to his membership in the MS-13 and involvement in the April 11 Murders.

Thereafter, the defendant was removed from the Western District of Virginia to the EDNY to face the instant charges.

Subsequently, the government filed a motion to transfer the defendant to adult status for trial, pursuant to 18 U.S.C. §§ 5031 et seq., and, following an evidentiary hearing, the Court ordered that the defendant stand trial as an adult (the "Transfer Decision"). Thereafter, the defendant waived indictment and pleaded guilty, without a plea agreement with the government, to Racketeering, including predicate racketeering acts relating to the Llivicura, Lopez, Tigre and Villalobos murders.

## II. The Defendant Should Be Sentenced to 60 Years in Prison

For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to 60 years in prison.

### A. Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a). Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]" Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S. 38, 46-49 (2007)). However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a). Id. That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and
>
> (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide

4

>the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

In the <u>Miller</u> decision, the Supreme Court discussed differences between juvenile and adult behavior and characteristics, and distilled that discussion into four factors a sentencing court must consider when sentencing a juvenile defendant: (1) the defendant's chronological age and characteristics, including immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the family and home environment that surrounded the defendant; (3) the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct; and (4) the possibility of rehabilitation (referred to herein as the "<u>Miller</u> factors").[3]  <u>Miller</u> at 2468.  As set forth below, in connection with the analysis of the § 3553(a) factors, while the Court must consider the defendant's age, family and social background, and possibility of rehabilitation, these factors, and more importantly the facts and circumstances of the April 11, 2017 quadruple murder overwhelmingly weigh in favor of a sentence of 60 years in prison.

B.   <u>Analysis</u>

Here, pursuant to the recent decisions of the Supreme Court, the Court's "starting point and the initial benchmark" when determining the defendant's sentence should be the effective Guidelines range of life.  <u>Kimbrough</u> at 108 (citing <u>Gall</u> at 50 and <u>Rita v. United States</u>, 168 L. Ed. 203, 213 (2007)).  In light of the sentencing factors set forth by Congress in § 3553(a) and the Supreme Court in <u>Miller</u>, the government respectfully submits that the defendant should be sentenced to 60 years in prison.

As an initial matter, with respect to both § 3553(a)(1) and the third <u>Miller</u> factor (the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct), the offense of conviction is extremely serious and the extent of the defendant's participation in the April 11, 2017 quadruple murder weighs heavily in favor of a sentence at or near the advisory Guidelines sentence of life.  The evidence overwhelmingly demonstrates that the defendant and his fellow MS-13 members committed the brutal, execution-style murders of four young men, and attempted to murder a fifth man, who they suspected were rival gang members who had disrespected the MS-13.  Further, the evidence establishes that the defendant not only participated in the murders, by slashing the victims with a machete, but he was one of the most culpable participants who engaged in substantial

---

[3] While the government acknowledges that the <u>Miller</u> decision is applicable to this case, the Court should note that there are significant factual distinctions between the defendant and the <u>Miller</u> defendants, most importantly, the nature of the applicable murders and the significant premeditation present here, which was not the case in <u>Miller</u>.

5

planning over a period of months and weeks before the murder and devised a premeditated plan to lure the victims to their death. Moreover, the defendant's significant role in the April 11 Murders was further demonstrated on the day of the murders when he obtained permission from the Leeward clique leaders to carry out the murders, maintained constant communication with the two female co-conspirators to coordinate the timing of the attack, advised the other armed MS-13 members of the victims' location, and then participated in the murders, repeatedly striking the victims with a machete. The degree of premeditation from the defendant heightens the seriousness of the offense and the need for a substantial sentence. The nature of the defendant's conduct was not just extremely serious, it was evil and merits a sentence of 60 years in prison.

While the defendant's only prior criminal conviction was for prohibited occupancy, a misdemeanor violation of a Town of Islip ordinance, there are other aspects of the defendant's background that weigh in favor of a significant sentence. Since being transferred to the EDNY for prosecution, in July 2017, the defendant has been housed at the Suffolk County Correctional Facility ("Suffolk Jail"), where he has participated in two violent assaults. First, on July 30, 2017, the defendant and Asael Mayen-Portillo, a fellow MS-13 member and co-conspirator in the April 11 Murders, assaulted another inmate who was associated with the rival Bloods street gang. The victim suffered bruising and pain to his face. Furthermore, the defendant and Mayen-Portillo ignored multiple commands to stop forcing officers at the prison to use a non-lethal pepper spray on the defendant to end the assault. More recently, on March 4, 2019, the defendant was involved in another altercation with an inmate on his tier. Therefore, although the defendant has a limited criminal history, the prison assaults that he participated in demonstrate the defendant's continued association with the MS-13 and his proclivity towards violence and criminal conduct, even while incarcerated.

In addition, as highlighted in the government's motion to transfer the defendant to adult status, the defendant engaged in defiant conduct for 7-8 years leading up to the April 11 Murders, in both El Salvador and the United States. The defendant concedes in his sentencing memorandum that his family hired a "coyote" to illegally smuggle him into the United States because of behavior issues he was having in El Salvador. Def. Mem. at 3. Specifically, the defendant began smoking cigarettes and marijuana, drinking alcohol and behaving in a defiant manner at age eight, and such behavior continued until age 14 when he was sent to the United States. Id. The Court recognized in the Transfer Decision that "[t]he defendant had the benefit of a supportive family in El Salvador, as well as the United States," but "he became disobedient in El Salvador and began interacting with MS-13 gang members." Transfer Decision at 2. Further, after arriving in the United States, the Court noted that the defendant "rejected the support structure his mother tried to provide, and instead almost immediately chose to become a member of the MS-13 gang, with full knowledge of its violent nature and mission." Id.

Further, during his relatively brief tenure at Central Islip High School ("CIHS"), the defendant's school records demonstrate a consistent pattern of disciplinary and attendance

issues. Specifically, the defendant had a history of unexcused absences that resulted in the school referring him to the Suffolk County Probation Department ("Probation") for supervision as a truant. Additionally, he was routinely disciplined for deliberate disobedience of school rules and being disruptive. For example, the defendant was cited for smoking marijuana on school grounds on December 14, 2016, entering the girls bathroom on April 21, 2017 (ten days after committing the April 11 Murders), and for repeatedly being insubordinate, disrespectful, in unauthorized areas, continually late to class and leaving the school without permission. As a result of habitually violating school rules, the defendant received in-school suspension four times and was suspended from school on three occasions. Not surprisingly, given the defendant's poor attendance record, and disruptive behavior when present, his academic record was also poor.

In December 2016, staff members at the CIHS referred the defendant to Probation for supervision and treatment related to the defendant's truancy record in Fall 2016. Specifically, the defendant's attendance record included twenty full days' truancy and 12 days of partial truancy. Following an initial intake interview, Probation referred the defendant to the Community Reinvestment Program ("CRP"), a diversion program which counsels at-risk youth to address his substance abuse (marijuana), and teach him the tools necessary to strengthen his family relationships, avoid gang involvement, violence and criminal detention, while improving school attendance and performance. In February 2017, the defendant underwent evaluation and counseling at CRP, as did his mother. See CRP Report. Notably, the defendant's CRP report indicated that the defendant did not follow parental rules and would come and go as he pleased. Id. at 2. His mother reported there being multiple nights when she got home from work at 2:00 a.m. and the defendant was still out with friends. Id. at 4. She further expressed that the defendant's whereabouts and social connections were of great concern to her because she suspected that he could be involved with a gang. Id. Furthermore, during a meeting regarding the defendant between a CRP case manager and staff members from the CIHS, the school officials advised that the defendant surrounded himself with known gang members, that he was disruptive in class, and was extremely disrespectful to staff, "especially an elderly aid that he made cry on several occasions." Id. at 5. There were also several incidents at school when the defendant was found in the hallways without a pass and ran away from school staff and security. Id. Taken together, the defendant's conduct reflects negatively on the defendant's character and undermines the defendant's argument that he is a good candidate for rehabilitation, which is a consideration under the fourth Miller factor.

The defendant's argument for a reduced sentence focuses on his age and social background, which relate the second prong of § 3553(a)(1), as well as the first and second Miller factors ((1) the defendant's chronological age and characteristics, including immaturity, impetuosity, and failure to appreciate risks and consequences; and (2) the family and home environment that surrounded the defendant). While the Court should consider these factors, they do not warrant a significant sentencing reduction below the government's recommendation.

7

First, one of the factors the defendant cites in support of a reduced sentence was his age at the time of the April 11 Murders, which he contends were somehow the result of adolescence or immaturity. Def. Mem. at 6-7. While, pursuant to both Miller and § 3553(a), the Court should consider the defendant's age at the time of the April 11 Murders, this factor does not warrant a significant sentencing reduction, as recommended by the defendant.

The defendant cites to the Supreme Court's decisions in Miller, Montgomery v. Louisiana, 136 S. Ct. 718, 736 (2016), and Roper v. Simmons, 543 U.S. 551, 570 (2005) for the proposition that, inter alia, juvenile defendants lack maturity, which results in them engaging in reckless, impulsive and risk-taking behavior, and are less culpable than adult defendants. Def. Mot. at 1-2. However, this argument ignores the facts of this case. As set forth above, the April 11 Murders were not disorganized or the impulsive result of immaturity or reckless reaction. To the contrary, the murders were carefully planned executions, wherein the defendant and his co-conspirators identified the victims as rival gang members, marked them for death, formulated a plan to murder them, obtained the requisite authorization from gang leadership to follow through on their plans, obtained weapons to carry out the murders, and lured the victims to their demise in an isolated wooded area, where there would be no witnesses. Moreover, the defendant played a key role in each phase of the murders, including the planning, luring and killings. The defendant's ability to engage in logical and coherent thought patterns when planning callous acts of violence distinguishes this case from other juvenile murder cases and successfully contradicts the Miller arguments advanced by the defense. Still further, despite his age at the time of the April 11 Murders, the defendant had significantly greater life experience than most other individuals his age. When he was 14 years-old, he traveled unaccompanied from El Salvador to the United States and illegally crossed the border, before traveling to New York. Thus, the defendant's age at the time of the murders should not be given significant weight.

Second, while the defendant encountered some difficulties in his upbringing, it is was devoid of poverty or any abuse, see PSR at ¶ 78, and indistinguishable from countless other immigrants from El Salvador, who encounter similar (or more challenging) issues of separation and hardship, but do not join the MS-13 and commit horrific acts of violence. Particularly notable, is the fact that the defendant does not claim he was coerced or otherwise forced to join the MS-13 or joined the gang without understanding its criminal purpose. To the contrary, the defendant admits that he joined the MS-13 because he "had a desire for respect" and "he thought that the gang would allow him easier access to friends, women and marijuana, which he had been using regularly since his arrival in the U.S." Def. Mem. at 4 (citing report of Dr. Eric Goldsmith). Moreover, unlike many other defendants sentenced by the Court, the defendant's family attempted to provide him with guidance and better opportunities in life. For a majority of his life, the defendant lived with his grandmother in El Salvador and she raised him in a loving environment and he was well-cared for. PSR at ¶ 78. Notwithstanding her care and effort, the defendant engaged in defiant behavior in El Salvador, and his grandmother arranged for him to illegally enter the United States, where he joined his

8

mother. However, despite his mother's best efforts, the defendant immediately began using drugs and affiliating with MS-13 members upon his arrival on Long Island. Transfer Decision at 2. Despite his supportive family, the defendant chose to join the MS-13 at an early age, and committed the April 11 Murders days before his 16th birthday.

As set forth above, the "nature and circumstances of the offenses" and the "history and characteristics" of the defendant both strongly warrant a sentence of 60 years in prison, pursuant to § 3553(a)(1). However, the Court must also consider the factors set forth in § 3553(a)(2)(A)-(C), which provide that a sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These factors also weigh heavily in favor of a sentence of 60 years.

As an initial matter, in regard to factor § 3553(a)(2)(B), affording adequate deterrence to criminal conduct, Long Island has been plagued by gang violence over the past two decades; especially violence perpetrated by members of the MS-13. Over the past decade, the Court has presided over numerous MS-13 cases, wherein dozens of MS-13 members and associates have been prosecuted for violent crimes, including more than 50 murders. A sentence of 60 years in prison would send a strong message that violent conduct such as that engaged in by the defendant and his fellow MS-13 gang members, including executing four young men because they were perceived to be rival gang members or to have disrespected the MS-13, will not be tolerated and will have severe consequences.

Finally, and perhaps most significantly, with respect to factors § 3553(a)(2)(A) and (C), for the reasons set forth above, the April 11, 2017 quadruple murder was an extremely serious offense and needs to be adjudicated in a manner that will promote respect for the law, provide just punishment for the offenses, and protect the public from further crimes of the defendant. With respect to specific deterrence, the defendant's sentencing memorandum claims that because he will be deported to El Salvador at the end of his sentence, "[h]e will never present a danger to the U.S. community." Def. Mem. at 5. However, this claim ignores the fact that once released from prison and deported, the defendant could easily reenter the United States as hundreds of thousands of illegal immigrants do every year. Moreover, this argument ignores the fact that if released and deported, the defendant could continue his membership in the MS-13 and "present a danger" in El Salvador, including a specific threat to family members of the victims of the April 11 Murders, witnesses and/or cooperating defendants in this prosecution.

As set forth above, beginning in December 2016, the defendant was referred to Probation and began counseling designed to move him away from his negative behavioral trends, and help prevent him from engaging in violent and criminal conduct. Specifically, at CRP, the defendant underwent evaluation and treatment designed to provide the tools needed to be successful in school, stop abusing marijuana, strengthen his family relationships, and,

most significantly, avoid destructive associations with gang members and getting involved in gang related acts of violence and other criminal behavior. Clearly, the efforts to rehabilitate the defendant failed. While undergoing weekly counseling and claiming to have a willingness to improve himself to his case manager, the defendant was strengthening his bond with the MS-13 and taking on a principal role in the weeks-long planning and execution of the April 11 Murders. The fact that the defendant was strengthening his ties to the gang and committing the charged crimes while undergoing treatment, is a clear indication that a 60-year sentence is necessary to deter the defendant from further violent crimes and to protect the public.

Moreover, with respect to § 3553(a)(2)(A) and (C), it warrants emphasis that the defendant was the driving force behind the April 11 Murders and he played a central role in planning and carrying out the murders, including: being involved in the initial confrontation with Witness-1 and several of the victims at a 7-11; devising the plan to kill the victims, who were suspected of being rival gang members, by using female MS-13 associates to lure them into an isolated wooded area; obtaining permission from the leaders of the Leeward clique to carry out the murders; recruiting other MS-13 members and associates to commit the murders; coordinating the attack with the two female MS-13 associates, who lured the victims into the woods; and physically participating in the murders by striking the victims with a machete. The defendant's actions outlined above are significant for several reasons. First, they demonstrate the significant and active role he played in the April 11 Murders. Second, they undermine the defendant's sentencing argument that his participation in the April 11 Murders was impetuous, reckless or the result of immaturity. Third, the defendant's actions warrant a 60-year sentence in order to achieve specific deterrence and to protect the public from further crimes of this defendant.

### III. Conclusion

Mere words fail to sufficiently capture the depravity of the conduct of the defendant and his fellow MS-13 gang members, who lured five young men into a wooded area in Central Islip, where they attacked them with machetes, knives, tree limbs. One of the men was able to escape, but the other four were viciously and brutally attacked and killed. After killing the four men, Portillo and his co-conspirators dragged the victims' bodies a short distance and left them in a pile. While the defendant was a juvenile at the time of the quadruple murder, he played a crucial role in those murders, which were premeditated and callous. Nothing in the defendant's background justifies such violence, and the § 3553(a) and Miller factors discussed above strongly warrant a significant sentence to deter the defendant and other MS-13 members from committing horrific acts of violence, and to protect the public from further crimes of this defendant. Accordingly, for all of the reasons set forth above and in the

government's supplemental submission, the government respectfully submits that the Court should sentence the defendant to 60 years in prison.

          Respectfully submitted,

          RICHARD P. DONOGHUE
          United States Attorney

By:   /S/
      John J. Durham
      Paul G. Scotti
      Assistant U.S. Attorneys
      (631) 715-7851/7836

cc:    Joseph Ryan, Esq. (By ECF and email)
       USPO Lisa A. Langone (By email)
       Clerk of the Court (JFB) (By ECF)